# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CRIMINAL NO.** H-16-433-1 |
| | § | |
| **DREW MELVIN DILLON WATSON,** | § | |
| **Defendant** | § | |

## PLEA AGREEMENT

The United States of America, by and through Kenneth Magidson, United States Attorney

for the Southern District of Texas, Sherri L. Zack, Assistant United States Attorney, and the

defendant, Drew Melvin Dillon Watson ("Defendant"), and Defendant's counsel, Marjorie Myers,

pursuant to Rule **11(c)(1)(A)** of the Federal Rules of Criminal Procedure, state that they have

entered into an agreement, the terms and conditions of which are as follows:

### Defendant's Agreement

1.  Defendant agrees to plead guilty to Counts One and Four of the Criminal Indictment.

Count One charges Defendant with **Coercion and Enticement**, in violation of Title 18, United

Sates Code, Section 2422(b). Count Four charges Defendant with **Possession of Child**

**Pornography**, in violation of Title 18, United Sates Code, Section 2252A(a)(5)(B), 2252A(b)(2)

and 2256(8)(A). Defendant, by entering this plea, agrees that he is waiving any right to have

the facts that the law makes essential to the punishment either charged in the indictment, or

proved to a jury, proven beyond a reasonable doubt.

### Punishment Range

2.  The **statutory** maximum penalty for a violation of Title 18, United States Code,

Section 2422(b), is imprisonment for no less than 10 years and up to life and a fine of not more

than $250,000. Additionally, Defendant will receive a term of supervised release after imprisonment of at least 5 years to life. *See* Title 18, United States Code, Section 3583(k). The **statutory** maximum penalty for a violation of Title 18, United States Code, Section 2252A(a)(5)(B), 2252A(b)(2) and 2256(8)(A) is imprisonment for up to 10 years and a fine of not more than $250,000. Additionally, Defendant will receive a term of supervised release after imprisonment of at least 5 years to life. *See* Title 18, United States Code, Section 3583(k). Defendant acknowledges and understands that if he should violate the conditions of any period of supervised release which may be imposed as part of his sentence, then Defendant may be imprisoned for the entire term of supervised release, without credit for time already served on the term of supervised release prior to such violation. *See* Title 18, United Stated Code, Sections 3559(a)(1) and 3583(e)(3). Defendant understands that he cannot have the imposition or execution of the sentence suspended, nor is he eligible for parole.

## Mandatory Special Assessment

3. Pursuant to Title 18, United States Code, Section 3013(a)(2)(A), immediately after sentencing, Defendant will pay to the Clerk of the United States District Court a special assessment in the amount of one hundred dollars ($100.00). The payment will be by cashier's check or money order, payable to the Clerk of the United States District Court, c/o District Clerk's Office, P.O. Box 61010, Houston, Texas 77208, Attention: Finance.

4. Pursuant to Title 18, United States Code, Section 3014(a)(3), if the court determines that the Defendant is a non-indigent person, the Defendant will pay to the Clerk of the United States District Court a special assessment in the amount of five thousand dollars ($5000.00) per count of conviction. The payment will be by cashier's check or money order, payable to the Clerk of

2

the United States District Court, c/o District clerk's Office, P.O. Box 61010, Houston, TX 77208, Attention: Finance.

## Immigration Consequences

5. Defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Defendant understands that if he is not a citizen of the United States, by pleading guilty he may be removed from the United States, denied citizenship, and denied admission to the United States in the future. Defendant's attorney has advised Defendant of the potential immigration consequences resulting from Defendant's plea of guilty.

## U.S. Sentencing Guidelines

7. Defendant is aware that a sentence has not yet been determined by the Court. Defendant is also aware that any estimate of the possible sentencing range under the sentencing guidelines that he may have received from his counsel, the United States, or the Probation Office, is a prediction and not a promise, did not induce his guilty plea, and is not binding on the United States, the Probation Office, or the Court. The United States does not make any promise or representation concerning what sentence the defendant will receive. Defendant further understands and agrees that the United States Sentencing Guidelines are "effectively advisory" to the Court. *See United States v. Booker*, 543 U.S. 220 (2005). Accordingly, Defendant understands that, although the Court must consult the Sentencing Guidelines and must take them into account when sentencing Defendant, the Court is not bound to follow the Sentencing Guidelines nor sentence Defendant within the calculated guideline range.

## The United States' Agreements

8. The United States agrees to each of the following:

(a)    If Defendant pleads guilty to Counts 1 and 4 of the Criminal Indictment and persists in that plea through sentencing, and if the Court accepts this plea agreement, the United States will move to dismiss Counts 2 and 3 of the Criminal Indictment at the time of sentencing;

(b)    If the Court determines that Defendant qualifies for an adjustment under section 3E1.1(a) of the United States Sentencing Guidelines, and the offense level prior to operation of section 3E1.1(a) is 16 or greater, the United States will move under section 3E1.1(b) for an additional one-level reduction because Defendant timely notified authorities of his intent to plead guilty, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources more efficiently.

## Agreement Binding

9.    The United States Attorney's Office for the Southern District of Texas and the United States Department of Justice, Criminal Division agree that neither will further criminally prosecute Defendant in the Southern District of Texas for offenses arising from conduct charged in the Indictment.    This plea agreement binds only the United States Attorney's Office for the Southern District of Texas, the Child Exploitation and Obscenity Section of the United States Department of Justice's Criminal Division, and Defendant.    It does not bind any other United States Attorney's Office.    The United States Attorney's Office for the Southern District of Texas will bring this plea agreement and the full extent of Defendant's cooperation to the attention of other prosecuting offices, if requested.

## United States' Non-Waiver of Appeal

10.    The United States reserves the right to carry out its responsibilities under guidelines sentencing.    Specifically, the United States reserves the right:

(a)    to bring its version of the facts of this case, including its evidence file and any investigative files, to the attention of the Probation Office in connection with that office's preparation of a presentence report;

(b)     to set forth or dispute sentencing factors or facts material to sentencing;

(c)     to seek resolution of such factors or facts in conference with Defendant's counsel and the Probation Office;

(d)     to file a pleading relating to these issues, in accordance with section 6A1.2 of the United States Sentencing Guidelines and Title 18, United States Code, section 3553(a); and

(e)     to appeal the sentence imposed or the manner in which it was determined.

### Sentence Determination

11. Defendant is aware that the sentence will be imposed after consideration of the United States Sentencing Guidelines and Policy Statements, which are only advisory, as well as the provisions of Title 18, United States Code, Section 3553(a). Defendant nonetheless acknowledges and agrees that the Court has authority to impose any sentence up to and including the statutory maximum set for the offense to which Defendant pleads guilty, and that the sentence to be imposed is within the sole discretion of the sentencing judge after the Court has consulted the applicable Sentencing Guidelines. Defendant understands and agrees that the parties' positions regarding the application of the Sentencing Guidelines do not bind the Court and that the sentence imposed is within the discretion of the sentencing judge. If the Court should impose any sentence up to the maximum established by statute, or should the Court order any or all of the sentences imposed to run consecutively, Defendant cannot, for that reason alone, withdraw a guilty plea, and will remain bound to fulfill all of the obligations under this plea agreement.

**Rights at Trial**

12.   Defendant understands that by entering into this agreement, he surrenders certain rights as provided in this plea agreement.   Defendant understands that the rights of a defendant include the following:

>   (a)   If Defendant persisted in a plea of not guilty to the charges, Defendant would have the right to a speedy jury trial with the assistance of counsel.   The trial may be conducted by a judge sitting without a jury if Defendant, the United States, and the court all agree.

>   (b)   At a trial, the United States would be required to present witnesses and other evidence against Defendant.   Defendant would have the opportunity to confront those witnesses and his attorney would be allowed to cross-examine them.   In turn, Defendant could, but would not be required to, present witnesses and other evidence on his own behalf.   If the witnesses for Defendant would not appear voluntarily, he could require their attendance through the subpoena power of the court; and

>   (c)   At a trial, Defendant could rely on a privilege against self-incrimination and decline to testify, and no inference of guilt could be drawn from such refusal to testify.   However, if Defendant desired to do so, he could testify on his own behalf.

**Factual Basis for Guilty Plea**

13.   Defendant is pleading guilty because he is in fact guilty of the charge contained in Counts 1 and 4 of the Criminal Indictment.   If this case were to proceed to trial, the United States could prove each element of the offense beyond a reasonable doubt.   The following facts, among others would be offered to establish Defendant's guilt:

On May 13, 2016, Lansing Police Department, of Lansing, Illinois, received a complaint which alleged that a 15-year-old black male, hereinafter referred to as KM, was the victim of indecent solicitation of a minor. The report, which was filed by KM's mother, explained that she had dropped off KM outside a friend's house at an address on Ridgewood Avenue in Lansing, Illinois, where she understood KM would be staying for the weekend. After dropping off KM, she

felt something was suspicious and looped around the block to investigate. When she returned to the aforementioned address, she observed KM getting into a white vehicle bearing a partial Illinois State license plate of "V99". KM's mom observed a stocky white male, approximately 30 years of age, seated in the driver's seat of the vehicle. She approached the vehicle and confronted the driver. During the short confrontation, KM exited the passenger's side of the vehicle and the driver immediately departed the area. Together, KM and his mother reported the incident to Lansing PD.

During the filing of the incident report, KM advised that he had been communicating with the unidentified white male via cell phone for approximately one month and knew him by the name Drew Dillon Watson. KM met Watson through a school friend who had also been in contact with Watson via social media. KM advised that Watson resided in Texas, but had travelled to the area with plans to hang out with KM at a local area hotel. KM stated that he and Watson had engaged in sexually explicit conversations via text messages and social media and that this was their first time meeting in person. A review of KM's cellular telephone identified Watson's telephone number as 713-487-6771.

After obtaining a Texas State driver's license photograph of Drew Dillon Watson, Lansing PD requested that KM's mother attempt to identify Watson in a photo lineup which contained six white males that appeared to be of similar age. She positively identified Watson as the man she had observed and confronted outside of an address on Ridgewood Avenue in Lansing, Illinois.

A consensual review of KM's personal electronic devices revealed numerous conversations between KM and Watson via Kik, Snapchat, Skype and text message. A review of the Kik application on KM's phone revealed a chat session with a user identified as

7

"drewtwo99". Kik user drewtwo99 had a profile picture which portrayed a white male that matched the physical description of Drew Dillon Watson. KM and Watson discussed being homosexual and Watson suggested that KM utilize "Grindr" to meet people, but warned that users are supposed to be at least 18 years of age. Watson also provided his Snapchat user handle as "drewtwo99".

A review of KM's cellular telephone revealed a note application with one entry dated May 3, 2016, which was entitled, "The plan". In summary, the text outlined several steps that involved KM packing clothing and lying to his mother so that she would believe KM was spending the weekend with school friends at Six Flags, band practice, tennis practice and sleep-overs. In fact, KM had planned to meet up with Watson so that they could spend the weekend together.

Investigators interviewed KM's friends, to include a fellow high school student hereinafter referred to as BR. BR advised that she had also been in contact with Drew Watson via Skype and she knew Watson by his Skype user handle, "drewtwo99". BR was aware of KM's relationship with Watson and stated that she believed KM and Watson were sexually active over the phone. BR explained that KM had previously engaged her in a conversation by stating, "I think I just lost my virginity over the phone." KM had also referred to Watson as his boyfriend.

BR acknowledged being aware that KM and Watson had made a plan to get together, but did not know the details of what had occurred on May 13, 2016. However, on Sunday, May 15, 2016, at approximately 6:50 PM, BR reached out to Watson via Skype in order to find out what had occurred. Watson expressed he was worried about KM and stated, "This is my fault. I

8

shouldn't have let him put himself at such risk knowing how his mom and dad would react."

On May 17, 2016, at approximately 8:13 PM, BR and Watson connected again via Skype and discussed the events of May 13, 2016. Watson typed, "I came up to see him [KM], was waiting outside his friend's house, his mom dropped him off, he came over to my car, was about to get in, and then his mom circled back around, saw him, and told him he wasn't going to go with me because she didn't know me, he lied and said I was your dad, I played along because I was on the spot, but she obviously didn't believe it. And that was it. That was the last time I saw or talked to [KM]." When BR asked if KM and Drew were going to "do stuff", Watson stated, "We didn't have firm plans, just a sort of see what happens attitude." When asked if he was still in the area, Watson responded, "no"..."I left immediately"..."flew back home that night". BR also asked Watson if he knew how old KM was and stated, "...cause he's still a kid". Watson simply replied, "yes I know".

Investigators interviewed another high school friend of KM, hereinafter referred to as CV. CV stated he had been in contact with Drew Watson via Skype and was familiar with the plan for KM and Watson to get together. KM had told CV that he and Watson had talked about having sex together when they finally met. KM elaborated by stating, "Drew is going to get me drunk and we're gonna have sex." According to CV, KM reported to CV that Watson had told KM to practice on himself in order to prepare his body for anal sex.

Based on the above, and that the matter appeared to indicate that Watson traveled across state lines in attempt to engage in sexual conduct with a minor, Lansing PD contacted and requested the assistance of the Federal Bureau of Investigation.

On May 23, 2016, KM was interviewed by Special Agents out of FBI Chicago. KM

9

identified himself as a 15-year-old student that attends a high school in Lansing, Illinois. KM acknowledged having met an adult male online who he knew as Drew Dillon Watson. KM estimated that he and Watson began their online relationship on or about April 16, 2016, and during that time had communicated via text message, telephone calls, Skype, Kik and Snapchat. KM confirmed Watson's telephone number as 713-487-6771 and identified Watson's online user handles for Kik, Snapchat and Skype as "drewtwo99".

During those online communications, which occurred every day, Watson had stated he was approximately 30 years old and had formerly been employed as a physics teacher at a Texas area high school. KM informed Watson that he was a 16-year old high school student at a school in Lansing, Illinois. As the communications progressed, Watson and KM began sending images and videos to one another. According to KM, Watson sent full body nude images of himself, to include images of his penis, to KM's cellular telephone. KM stated that he only sent images of his face to Watson.

After it was brought up by KM, Watson expressed an interest in traveling to Illinois to meet KM in person. Watson created a list of activities they could do together during the visit, which included dinner at 'Two' restaurant in Chicago, Illinois on Saturday, May 16, 2016, at 7:00 PM. Watson also expressed concern for how much trouble he could get into if the two of them were caught together.

According to the plan, Watson was to take a flight, via Southwest Airlines, on Thursday, May 12, 2016, from Houston, Texas to Chicago, Illinois. Upon his arrival, Watson was to pick up a rental car from the airport and proceed to a hotel he had reserved just across the state line in Indiana. Watson stated that he planned to remain in the area until the following Monday, May

10

16, 2016.

KM and Watson had derived a plan in which Watson would pick up KM on Friday, May 13, 2016. KM was to be dropped off outside a friend's residence before being picked up by Watson so that they could spend the weekend together. KM believed Watson's intentions to be sexual in nature in consideration that he and Watson had discussed engaging in various sex acts once they were alone. KM has not communicated with Watson since the events involving his mother and Watson on the afternoon of May 13, 2016.

Although KM had made attempts to delete his communications with Watson, an extraction of KM's cellular telephone, an Apple iPhone, revealed the presence of a text chat between KM and a contact labeled "unknown2". In a follow-up interview, KM positively identified user "unknown2" as Drew Dillon Watson.

A review of the aforementioned chat communications revealed that segments of the chats, to include any images and/or videos, appeared to be missing; however, a general summary of what was recovered was highlighted for relevance below. Furthermore, it was noted that the date and time stamps associated with each respective communication appeared to be incorrect. For example, an early entry in the communications was dated August 18, 1934. As a result, the dates used to mark each communication below were primarily utilized for reference purposes.

### Knowledge of Engaging With a Minor

On May 8, 2016, KM stated, "I'm only 16 lol", to which Watson responded, "you can work at 16". Watson then provided KM with multiple links regarding child labor laws.

### Communications Regarding Sexually Explicit Conduct

On May 4, 2016, KM communicated to Watson that he had morning wood, which was

11

understood to mean that KM had an erection. Watson responded, "Well if I were there I'd help you out". "I'd suck you off and drink your cum". "Eveyr last drop".

On May 6, 2016, KM expressed to Watson that he was nervous regarding a conference tennis match he was about to compete in. Watson responded, "just take a deep breath and think about me shoving my cock down your throat instead"… "or me eating out that ass". KM responded, "Omfg drew".

After learning of KM's success in the aforementioned tennis match, Watson expressed an interest in rewarding KM. Watson initially suggested "kisses"; however, after KM asked for more than kisses Watson stated, "You sure you want me to fuck you?" Approximately five minutes later Watson said, "…I can't wait to see that booty, lock your hole and fill it with my dick".

On May 9, 2016, Watson stated, "chupa mi pene, beb ?" KM responded, "O…so this is wha it has come to.."… "Si btw". Drew then stated, "I knew you were naughty". Google Translate for Spanish translated the text to say, "suck my cock, baby?"

On May 12, 2016, KM stated, "Ill give u kisses while my hand reaches down ur dick n strokes it repetitively". Watson responded, "omg baby I would love that. And I'd reach down and stroke yours while I kissed you back". KM then said, "Sweet, then I'll get down on my knees n unzip ur pants to reveal ur cock n it in my mouth". Watson responded, "mm baby then I'd put my hand on the back of your head and push you forward gently to take it all in down your throat."

On the same date, Watson stated, "…I'd love to kiss you all over your body and then grind up against you while you make me so hard".

**Communications Regarding "The Plan"**

On an unknown date and time, Watson stated, "So the plan is, I fly out Thursday night, get into Chicago and pick up my rental car at the airport, then drive to the Hotel. I should be at the hotel by around 1am or so in the morning, maybe 1:30am, on Friday morning".

On May 4, 2016, Watson stated, "just 10 more days baby and I'll be holding you in my arms". That was followed by, "next Friday"…"after you get out of school"…"make sure you get permission"…"I'm gonna meet the love of my life for the first time". It was noted that ten days from May 4, 2016, would place their planned meeting for May 13, 2016.

On May 6, 2016, KM said, "I can't wait to do all the things we've talked about". Watson responded, "me too ☺".

On May 11, 2016, Watson stated, "7740 Corinne Dr, Hammond, IN 46323". A Google query of the stated address revealed it was associated with Residence Inn by Marriott of Chicago Southeast. An administrative subpoena served to Residence Inn provided information which confirmed that Drew Watson, with a residential address on Post Oak Manor Drive in Houston, Texas, had prepaid a reservation for Room #301 with a scheduled check-in date of May 12, 2016, and a check-out date of May 16, 2016. The room was reserved and paid for with a Visa credit card number ending in 6757. A review of the Residence Inn surveillance cameras revealed Watson, checking into the hotel at approximately 2:59 AM on May 13, 2016, and departing the hotel, with his luggage, at approximately 8:08 PM later that same evening.

Also on May 11, 2016, Watson detailed that he planned to get to the hotel and sleep until it was time for him to pick KM up from school. Watson then requested to confirm KM's school

address. A Google query of the address revealed it was associated with KM's high school.

On May 13, 2016, Watson stated, "We have reservations for Saturday night at 7pm" at 'Two' in Chicago. 'Two' confirmed that the restaurant had on record a 7:00 PM party of two reservation for Saturday, May 14, 2016, under the name "Drew Watson". A 'Two' representative advised that the reservation was established online on May 12, 2016, and was confirmed via telephone number 713-487-6771 the following day.

Also on May 13, 2016, Watson advised, "I'm at the airport now". Approximately 50 minutes later, at 12:37 AM on May 14, 2016, Watson stated "I'm in Chicago waiting for my bag". That was followed approximately two hours later by Watson advising, "I made it to the hotel baby" and "I'm so close to you".

On May 14, 2016, at approximately 5:05 AM, Watson stated, "What time should I be at the spot to pick you up this afternoon" and "what side of the school is it on?" At approximately 8:00 AM, KM advised that they would have to change the meeting location and provided Watson with an address on Ridgewood Avenue as the new meeting location. At 10:16 AM, Watson advised that it would be an approximate 15 minute drive for him from the hotel. A Google Maps query mapping the distance between the Residence Inn of Chicago Southeast to the address on Ridgewood Avenue determined a travel time of approximately 12 – 15 minutes.

On the same date, at approximately 5:00 PM, Watson advised that he was at the pre determined meeting place, specifically parked in front of the agreed upon address on Ridgewood Avenue, and was driving a white in color hatchback Fiat bearing license plate number "V99 2352".

A review of the Residence Inn of Chicago Southeast parking lot surveillance camera

footage revealed video from the early morning hours of May 13, 2016, which appeared to portray a white in color Fiat, with a hatchback, entering and parking within the private parking lot of the Residence Inn. The arrival of said vehicle, which occurred at approximately 2:56 AM, was immediately followed by Watson checking into the hotel at 2:59 AM.

An administrative subpoena served to Southwest Airlines revealed that Drew Watson had traveled from William P. Hobby Airport (HOU) to Chicago Midway International Airport (MDW) via Southwest Airlines flight #1045 on May 12, 2016, with a departure time of 9:55 PM and a subsequent arrival time of May 13, 2016, at 12:15 AM. Watson was confirmed as a passenger on the flight on May 12, 2016, at 9:29 PM.

The flight was booked on April 25, 2016, at approximately 11:13 PM and confirmation messages were sent to e-mail address drewtwo99@gmail.com and to telephone number 713-487-6771. Watson had also provided a billing address to a residence on Post Oak Manor Drive in Houston, Texas.

A review of the full itinerary revealed Watson was originally scheduled to return from MDW to HOU via Southwest Airlines flight #898 on May 16, 2016, with a departure time of 10:00 PM and a subsequent arrival time of May 17, 2016, at 12:25 AM.

Records revealed Watson actually traveled from MDW to HOU via Southwest Airlines flight #898 on May 13, 2016, with a departure time of 10:00 PM and a subsequent arrival time of May 14, 2016, at 12:35 AM.

The flight was booked on May 13, 2016, at 7:03 PM and confirmation messages were sent to e-mail address drewtwo99@gmail.com and to telephone number 713-487-6771. Watson was confirmed as a passenger on the flight on May 13, 2016, at 9:42 PM. The flight was paid for

15

by a Visa with credit card number ending in 6757.

A review of Watson's Southwest Airlines reward profile further identified him as having a date of birth of XXX, XX, 1986 and a residential address to a home on Post Oak Manor Drive in Houston, Texas.

An administrative subpoena served to Kik in pursuit of subscriber information for user account "drewtwo99" revealed that the user consistently logged into the application utilizing IP address 172.56.14.74, which was registered to T-Mobile. Kik also identified the electronic device accessing the application as a Samsung Android device with model #SM-N910A. A Google query of the model number identified the device as a Samsung Galaxy Note 4. While the subscriber failed to provide a legitimate name for the drewtwo99 Kik account, they did provide a birth date which matched that of Drew Dillon Watson as well as a confirmed e-mail address of "drewtwo99@gmail.com". T-Mobile was unable to identify the subscriber associated with the named IP address.

An administrative subpoena served to Snapchat in pursuit of subscriber information for user account "drewtwo99" revealed the account was created from IP address 73.6.75.30, which was registered to Comcast. An administrative subpoena served to Comcast identified the subscriber as Drew Watson at an address on Post Oak Manor Drive in Houston, Texas.

On August 31, 2016, physical surveillance was conducted at the address on Post Oak Manor Drive in Houston, Texas. At approximately 6:12 AM, a white Chevrolet Volt bearing Texas State license plate number HLH 3915 was observed exiting the private garage of the residence. The driver of the vehicle was observed to be a white male, approximately 30 years of age, matching the physical description of Drew Dillon Watson.

At approximately 6:35 AM, the aforementioned motor vehicle was observed pulling into the private parking lot of an identified public middle school that serves approximately 1,000 students, grades 6 – 12. Furthermore, a review of the online staff directory identified Drew Watson as a Staff Instructor of Physics.

On September 1, 2016, United States Magistrate Judge Smith signed a search warrant and criminal complaint for the residence and person of Drew Watson respectively. That same day the search warrant was executed.

Watson was interviewed and at first he invoked his right to remain silent (on video). Watson then changed his mind and was brought back to the agent's car, where, on video, he waived his rights and made a statement. Watson stated that he traveled from Houston, TX to Chicago, Illinois to engage in a sexual relationship with Minor Victim 1 who he believed to be 16 years of age. This statement is corroborated by Minor Victim 1's statement that he lied to Watson about his age, telling Watson he was 16 when in fact he was 15.

The Defendant was a registered guest at a hotel in Indiana. While the hotel is called The Residence in of Chicago, Southeast it is physically in Indiana. The other activities that were scheduled were in Illinois. Under laws in either state, Watson committed or attempted to commit criminal sexual activity for which a person can be charged under state law. Under the laws of the State of Indiana, that is, the crime of solicitation of a person over the age of 14 but less than sixteen years of age by a person over the age of 21 years, in violation of Indiana Code Title 35-42-4-6(a) and under the laws of the State of Illinois, that is, the crime of Aggravated Criminal Sexual Abuse, in violation of 720 ILCS 5/11-1.60(d).

Watson further indicated that he was in possession of child pornography which he had

17

knowingly downloaded via the TOR browser and saved to an external media storage device. The external storage device was accessed on scene and 11 child pornography videos were copied by law enforcement. Once they were reviewed it was determined that all the videos contained child pornography. Ienovo laptop computer was used the child pornography discovered on the PNY USB storage device.

Watson unlocked his personal cell phone, a Samsung Galaxy Note 4, using his fingerprint. This is the cellphone he used to communicate with KM and make plans in Illinois/Indiana. Watson used the Internet, a means and facility of interstate commerce, to facilitate his criminal behavior.

### Breach of Plea Agreement

14. If Defendant should fail in any way to fulfill completely all of the obligations under this plea agreement, the United States will be released from its obligations under the plea agreement, and Defendant's plea and sentence will stand. If at any time Defendant retains, conceals, or disposes of assets in violation of this plea agreement, or if Defendant knowingly withholds evidence or is otherwise not completely truthful with the United States, then the United States may move the Court to set aside the guilty plea and reinstate prosecution. Any information and documents that have been disclosed by Defendant, whether prior to or subsequent to this plea agreement, and all leads derived therefrom, will be used against Defendant in any prosecution.

### Restitution, Forfeiture, and Fines – Generally

15. This Plea Agreement is being entered into by the United States on the basis of Defendant's express representation that he will make a full and complete disclosure of all assets over which he exercises direct or indirect control, or in which he has any financial interest.

18

Defendant agrees not to dispose of any assets or take any action that would effect a transfer of property in which he has an interest, unless Defendant obtains the prior written permission of the United States.

16. Defendant agrees to make complete financial disclosure by truthfully executing a sworn financial statement (Form OBD-500 or similar form) within 14 days of signing this plea agreement. Defendant agrees to authorize the release of all financial information requested by the United States, including, but not limited to, executing authorization forms permitting the United States to obtain tax information, bank account records, credit histories, and social security information. Defendant agrees to discuss and answer any questions by the United States relating to Defendant's complete financial disclosure.

17. Defendant agrees to take all steps necessary to pass clear title to forfeitable assets to the United States and to assist fully in the collection of restitution and fines, including, but not limited to, surrendering title, executing a warranty deed, signing a consent decree, stipulating to facts regarding the transfer of title and the basis for the forfeiture, and signing any other documents necessary to effectuate such transfer. Defendant also agrees to direct any banks which have custody of his assets to deliver all funds and records of such assets to the United States.

18. Defendant understands that forfeiture, restitution, and fines are separate components of sentencing and are separate obligations.

### Restitution

19. Defendant agrees to pay full restitution to KM. Defendant stipulates and agrees that as a result of his criminal conduct, the victims incurred a monetary loss in an amount to be determined either before sentencing or within 90 days of the sentencing hearing. Defendant

understands and agrees that the Court will determine the amount of restitution to fully compensate the victims. Defendant agrees that restitution imposed by the Court will be due and payable immediately and that Defendant will not attempt to avoid or delay payment. Subject to the provisions of paragraph 6 above, Defendant waives the right to challenge in any manner, including by direct appeal or in a collateral proceeding, the restitution order imposed by the Court.

### Forfeiture

20. Defendant stipulates and agrees that the property used or intended to be used, to commit or to facilitate the commission of the charge to which he is pleading guilty to, is subject to forfeiture, and Defendant agrees to the forfeiture of that property.

21. Defendant agrees to waive any and all interest in any asset which is the subject of a related administrative or judicial forfeiture proceeding, whether criminal or civil, federal or state.

22. Defendant consents to the order of forfeiture becoming final as to Defendant immediately following this guilty plea, pursuant to Federal Rule of Criminal Procedure 32.2(b)(4)(A).

23. Subject to the provisions of paragraph 6 above, Defendant waives the right to challenge the forfeiture of property in any manner, including by direct appeal or in a collateral proceeding.

## Fines

24.    Defendant understands that under the Sentencing Guidelines the Court is permitted to order Defendant to pay a fine that is sufficient to reimburse the government for the costs of any imprisonment or term of supervised release, if any.    Defendant agrees that any fine imposed by the Court will be due and payable immediately, and Defendant will not attempt to avoid or delay payment.    Subject to the provisions of paragraph 6 above, Defendant waives the right to challenge the fine in any manner, including by direct appeal or in a collateral proceeding.

## Notification of the Sex Offender Registration and Notification Act

25.    Defendant has been advised, and understands, that under the Sex Offender Registration and Notification Act, a federal law, he must register and keep the registration current in each of the following jurisdictions:    where he resides; where he is an employee; and where he is a student.    Defendant understands that the requirements for registration include providing his name, his residence address and the names and addresses of any places where he is or will be an employee or a student, among other information.    Defendant further understands that the requirement to keep the registration current includes informing at least one jurisdiction in which he resides, is an employee, or is a student not later than three (3) business days after any change of residence, employment, or student status.    Defendant has been advised, and understands, that failure to comply with these obligations subjects him to prosecution for failure to register under federal law, 18 U.S.C. Section 2250, which is punishable by a fine or imprisonment, or both.

**Complete Agreement**

27.   This written plea agreement, consisting of 24 pages, including the attached addendum of Defendant and his attorney, constitutes the complete plea agreement between the United States, Defendant, and Defendant's counsel.   No promises or representations have been made by the United States except as set forth in writing in this plea agreement.   Defendant acknowledges that no threats have been made against him and that he is pleading guilty freely and voluntarily because he is guilty.

28.   Any modification of this plea agreement must be in writing and signed by all parties.

Filed at _____*Houston*_____, Texas, on _____*December 16*_____ , 20__ .

_____
Defendant

Subscribed and sworn to before me on _____*December 16*_____ , 20*16*
DAVID J. BRADLEY, Clerk
UNITED STATES DISTRICT CLERK

By: _____
Deputy United States District Clerk

APPROVED:
Kenneth Magidson
United States Attorney

By: _____        _____
Sherri L. Zack                                                     Marjorie Myers
Assistant United States Attorney                      Attorney for Defendant
Southern District of Texas

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CRIMINAL NO.** |
| | § | |
| **DREW MELVIN DILLON WATSON,** | § | |
| **Defendant** | § | |

## PLEA AGREEMENT -- ADDENDUM

I have fully explained to Defendant his rights with respect to the pending Superseding Information. I have reviewed the provisions of the United States Sentencing Commission's Guidelines Manual and Policy Statements and I have fully and carefully explained to Defendant the provisions of those Guidelines which may apply in this case. I have also explained to Defendant that the Sentencing Guidelines are only advisory and the court may sentence Defendant up to the maximum allowed by statute per count of conviction. Further, I have carefully reviewed every part of this plea agreement with Defendant. To my knowledge, Defendant's decision to enter into this agreement is an informed and voluntary one.

_____     12 / 16 / 16
Attorney for Defendant                Date

I have consulted with my attorney and fully understand all my rights with respect to the Superseding Information pending against me. My attorney has fully explained, and I understand, all my rights with respect to the provisions of the United States Sentencing Commission's Guidelines Manual which may apply in my case. I have read and carefully reviewed every part of this plea agreement with my attorney. I understand this agreement and I voluntarily agree to its terms.

_____          _____12/16/2016_____
Defendant                                          Date